Warner JACKSON, Jennifer Evans, Wendell Harris, The Reverend Andrew Kennedy, Rabbi Isaac Serotta, Ceil Ann Libber, Father Thomas J. Mueller, Reverend John N. Gregg, Diane Brewer, Colleen Beaman, Mary Morris, Penny Morse, Kathleen Jones and Philip Jones, Plaintiffs-Respondents,

v.

John T. BENSON, Superintendent of Public Instruction, Department of Public Instruction and James E. Doyle, Defendants-Appellants-Petitioners,

Marquelle MILLER, Cynthia Miller, Angela Gray, Zachery Gray, Shon Richardson, George Richardson, Latrisha Henry, Faye Henry, Reigne Barrett, Valerie Barrett, Candice Williams, Senton Williams, Clintrai Giles, Sharon Giles, Intervenors-Defendants-Appellants,

PARENTS FOR SCHOOL CHOICE, Pilar Gonzalez, Dinah Cooley, Julie Vogel, Kate Helsper, Blong Yang, Gail Crockett, Yolanda Lassiter and Jeanine Knox, Intervenors-Defendants-Appellants-Petitioners.

MILWAUKEE TEACHERS' EDUCATION ASSOCIATION, by its President, M. Charles Howard, Michael Lengyel, Donald Lucier, Tracy Adams, Milwaukee Public Schools Administrators and Supervisors Council, Inc., by its Executive Director, Carl A. Gobel, People for the American Way, by its Executive Vice President and Legal Director, Elliott M. Mincberg, John Drew, Susan Endress, Richard Riley, Jeanette Robertson, Vincent Knox, Bertha Zamudio, James Johnson,

835

Robert Ullman and Sally F. Mills, Plaintiffs-Respondents,

v.

John T. BENSON, Superintendent of Public Instruction, Department of Public Instruction and James E. Doyle, Defendants-Appellants-Petitioners,

Marquelle MILLER, Cynthia Miller, Angela Gray, Zachery Gray, Shon Richardson, George Richardson, Latrisha Henry, Faye Henry, Reigne Barrett, Valerie Barrett, Candice Williams, Senton Williams, Clintrai Giles, Sharon Giles, Intervenors-Defendants-Appellants,

PARENTS FOR SCHOOL CHOICE, Pilar Gonzalez, Dinah Cooley, Julie Vogel, Kate Helsper, Blong Yang, Gail Crockett, Yolanda Lassiter and Jeanine Knox, Intervenors-Defendants-Appellants-Petitioners.

NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE, Felmers O. Chaney, Lois Parker, on behalf of herself and her minor child, Rashaan Hobbs, Derrick D. Scott, on behalf of himself and his minor children, Deresia C.A. Scott and Desmond L.J. Scott, Constance J. Cherry, on behalf of herself and her minor children, Monique J. Branch, Monica S. Branch, and William A. Branch, Plaintiffs-Respondents,

v.

John T. BENSON, Superintendent of Public Instruction of Wisconsin, in his official capacity, Defendant-Appellant.

Supreme Court

836

*No. 97–0270. Oral argument March 4, 1998.—Decided June 10, 1998.*

(Also reported in 578 N.W.2d 602.)

838

For the defendants-appellants-petitioners, John T. Benson, et al., there were briefs by *Edward S. Marion* and *Murphy & Desmond, S.C.*, Madison and *Kenneth W. Starr, Jay P. Lefkowitz, Theodore W. Ullyot* and *Kirkland & Ellis*, Washington, D.C., and oral argument by *Jay P. Lefkowitz*.

For the intervenors-defendants-appellants-petitioners, parents for school choice, et al., there were briefs by *Steve P. Hurley* and *Hurley, Burish & Milliken, S.C.*, Madison; *William H. Mellor, III, Clint Bolick, Nicole S. Garnett* and *Institute for Justice*, Washington, D,C, and *Michael D. Dean*, Waukesha and oral argument by *Clint Bolick*.

For the intervenors-defendants-appellants, Marquelle Miller, et al., there were briefs by *Kevin Potter* and *Brennan Steil*, Madison and *Richard P. Hutchison* and *Landmark Legal Foundation*, Kansas City, MO and oral argument by *Richard P. Hutchison.*

For the plaintiffs-respondents, Warner Jackson, et al., there was a brief by *Jeffrey J. Kassel, Melanie E. Cohen* and *LaFollette & Sinykin*, Madison; *Peter M. Koneazny* and *American Civil Liberties Union of Wisconsin Foundation, Inc.*, Milwaukee; *Steven R. Shapiro* and *American Civil Liberties Union Foundation*, New York, NY and *Steven K. Green* and *Americans United for Separation of Church & State*, Washington, D.C., and oral argument by *Jeffrey J. Kassel.*

For the plaintiffs-respondents, there was a brief by *Robert H. Chanin, John M. West* and *Bredhoff & Kaiser, P.L.L.C.*, Washington, D.C.; *Richard Perry, Richard Saks* and *Perry, Lerner & Quindel*, Milwaukee; *Bruce Meredith, Chris Galinat* and *Wisconsin Education Association*, Madison; *Elliot M. Mincberg, Judith Schaeffer*, Washington, D.C. and *Timothy Hawks* and *Schneidman, Myers, Dowling & Blumenfield*, Milwaukee and oral argument by *Robert H. Chanin.*

For the plaintiffs-respondents, NAACP, et al., there was a brief by *William H. Lynch* and *Law Offices of William H. Lynch*, Milwaukee and *James H. Hall,*

*Jr.,* and *Hall, Patterson & Charne,* Milwaukee and oral argument by *James H. Hall, Jr.*

Amicus curiae was filed by *K. Scott Wagner* and *Hale & Lein, S.C.,* Milwaukee and *James C. Geoly, Kevin R. Gustafson* and *Burke, Warren, MacKay & Serritella, P.C.,* Chicago, IL for the Center for Education Reform, American Legislative Exchange, CEO America, CEO Central Florida, CEO Connecticut, Putting Children First, James Madison Institute for Public Policy Studies, Jewish Policy Center, "I Have a Dream" Foundation (Washington, D.C. Chapter), Institute for Public Affairs, Liberty Counsel, Maine School Choice Coalition, Pennsylvania Manufacturers Association, Reach Alliance, Arkansas Policy Foundation, North Carolina Education Reform Foundation, Texas Justice Foundation, Minnesota Business Partnership, Minnesotans for School Choice, Toussaint Institute, South Carolina Policy Counsel, and United New Yorkers for Choice in Education.

Amicus curiae was filed by *Ralph I. Thomas,* Madison; *Steven T. McFarland, Kimberlee W. Colby* and *Christian Legal Society,* Annandale, VA and of counsel, *Thomas C. Berg* and *Cumberland Law School,* Birmingham, AL for The Christian Legal Society, Ethics and Religious Liberty Commission of the Southern Baptist Convention, Lutheran Church-Missouri Synod and the National Association of Evangelicals.

Amicus curiae was filed by *David R. Riemer,* Milwaukee for Howard L. Fuller, John O. Norquist, Steven M. Foti, Alberta Darling, Margaret A. Farrow, Joseph Leean, John S. Gardner, Warren D. Braun, Bruce R. Thompson, Jeanette Mitchell and David Lucey.

Amicus curiae was filed by *Daniel Kelly* and *McLario, Helm & Bertling, S.C.,* Menomonee Falls for the Family Research Institute, Christian Defense

Fund, Center for Public Justice, Family Research Council, Toward Tradition, Liberty Counsel and Focus on the Family.

Amicus curiae was filed by *Bradden C. Backer* and *Godfrey & Kahn, S.C.*, Milwaukee and *Robert L. Gordon* and *Weiss, Berzowski, Brady & Donahue*, Milwaukee for The Milwaukee Jewish Council for Community Relations and The Wisconsin Jewish Conference.

Amicus curiae was filed by *Marc D. Stern, Lois C. Waldmani* and *American Jewish Congress,* New York, NY for the American Jewish Congress.

¶ 1. DONALD W. STEINMETZ, J. This case raises a number of issues for review:

(1) Does the amended Milwaukee Parental Choice Program (amended MPCP) violate the Establishment Clause of the First Amendment to the United States Constitution? Neither the court of appeals nor the circuit court reached this issue. We conclude that it does not.

(2) Does the amended MPCP violate the religious establishment provisions of Wisconsin Constitution art. I, § 18? In a divided opinion, the court of appeals held that it does. We conclude that it does not.

(3) Is the amended MPCP a private or local bill enacted in violation of the procedural requirements mandated by Wis. Const. art. IV, § 18? The court of appeals did not reach this question, and the circuit court held it is. We conclude that it is not.

(4) Does the amended MPCP violate the uniformity provision of Wis. Const. art. X, § 3? The court of appeals did not reach this issue, and the circuit court

844

concluded that the amended MPCP does not violate the uniformity clause. We also conclude that it does not.

(5) Does the amended MPCP violate Wisconsin's public purpose doctrine, which requires that public funds be spent only for public purposes? The court of appeals did not reach this issue, and the circuit court concluded that the amended MPCP does violate the public purpose doctrine. We conclude that it does not.

(6) Should children who were eligible for the amended MPCP when this court's injunction issued on August 25, 1995, and who subsequently enrolled in private schools, be eligible for the program if the injunction is lifted? Neither court below addressed this issue. We conclude that they should.

¶ 2. This case is before the court on petition for review of a published decision of the court of appeals, *Jackson v. Benson*, 213 Wis. 2d 1, 570 N.W.2d 407 (Ct. App. 1997). The court of appeals, in a 2–1 decision, affirmed an order of the Circuit Court for Dane County, Paul B. Higginbotham, Judge, granting the Respondents' motion for summary judgment. The majority of the court of appeals concluded that the Milwaukee Parental Choice Program, Wis. Stat. § 119.23, as amended by 1995 Wis. Act 27, §§ 4002–4009 (amended MPCP), was invalid under Article I, § 18 of the Wisconsin Constitution because it directs payments of money from the state treasury for the benefit of religious seminaries. The majority of the court of appeals declined to decide whether the amended MPCP violates the Establishment Clause of the First Amendment or other provisions of the Wisconsin Constitution. In dissent, Judge Roggensack concluded that the amended MPCP did not violate either the federal or state constitution. The State appealed from the decision of the court of appeals. We granted the State's petition for review and

now reverse the decision of the court of appeals. We also conclude that the amended MPCP does not violate the Establishment Clause or the Wisconsin Constitution.

¶ 3. We are once again asked to review the constitutionality of the Milwaukee Parental Choice Program provided in Wis. Stat. § 119.23 (1995–96).[1] The Wisconsin legislature enacted the original Milwaukee Parental Choice Program (original MPCP) in 1989. *See* 1989 Wis. Act 336. As amended in 1993, the original MPCP permitted up to 1.5 percent of the student membership of the Milwaukee Public Schools (MPS) to attend at no cost to the student any private nonsectarian school located in the City of Milwaukee, subject to certain eligibility requirements.

¶ 4. Under the original MPCP, the legislature limited the students eligible for participation in the original program. To be eligible for the original MPCP, a student (1) had to be a student in kindergarten through twelfth grade; (2) had to be from a family whose income did not exceed 1.75 times the federal poverty level; and (3) had to be either enrolled in a public school in Milwaukee, attending a private school under this program, or not enrolled in school during the previous year. *See* Wis. Stat. § 119.23(2)(a)1–2 (1993–94).

¶ 5. The legislature also placed a variety of qualification and reporting requirements on private schools choosing to participate in the original MPCP. To be eligible to participate in the original MPCP, a private school had to comply with the anti-discrimination pro-

---

[1] Unless otherwise stated, all references to Wis. Stats. are to the 1995–96 version of the statutes.

visions imposed by 42 U.S.C. § 2000d[2] and all health and safety laws or codes that apply to Wisconsin public schools. *See id.* at § 119.23(2)(a)4–5. The school additionally had to meet on an annual basis defined performance criteria and had to submit to the State certain financial and performance audits. *See id.* at § 119.23(7), (9).

¶ 6. Under the original MPCP, the State Superintendent of Public Instruction was required to perform a number of supervisory and reporting tasks. The legislature required the State Superintendent to submit an annual report regarding student achievement, attendance, discipline, and parental involvement for students in the program compared to students enrolled in MPS in general. *See id.* at § 119.23(5)(d). The original MPCP further required the State Superintendent to monitor the performance of students participating in the program, and it empowered him or her to conduct one or more financial and performance audits of the program. *See id.* at § 119.23(7)(b), (9)(a).

¶ 7. Under the original MPCP, the State provided public funds directly to participating private schools. For each student attending a private school under the program, the State paid to each participating private school an amount equal to the state aid per student to which MPS would have been entitled under state aid distribution formulas. *See id.* at § 119.23(4). In the 1994–95 school year, this amount was approximately $2,500 per participating student. The amount

_____

[2] 42 U.S.C. § 2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

of state aid MPS received each year was reduced by the amount the State paid to private schools participating in the original program. *See id.* at § 119.23(5)(a).

¶ 8. The original MPCP withstood a number of state constitutional challenges in *Davis v. Grover*, 166 Wis. 2d 501, 480 N.W.2d 460 (1992). In *Davis*, this court first held that the original program, when enacted, was not a private or local bill and therefore was not subject to the prohibitions of Wis. Const. art. IV, § 18. *See id.* at 537. The court then held that the program did not violate the uniformity clause in Wis. Const. art. X, § 3 because the private schools did not constitute "district schools" simply by participating in the program. *See id.* at 540. The court finally held that the program, although it applied only to MPS, served a sufficient public purpose and therefore did not violate the public purpose doctrine. *See id.* at 546.

¶ 9. During the 1994–95 school year, approximately 800 students attended approximately 12 nonsectarian private schools under the original program. For the 1995–96 school year, the number of participating students increased to approximately 1,600 and the number of participating nonsectarian private schools increased to 17.

¶ 10. In 1995, as part of the biennial budget bill, the legislature amended in a number of ways the original MPCP. *See* 1995 Wis. Act 27, §§ 4002–4009. First, the legislature removed from Wis. Stat. § 119.23(2)(a) the limitation that participating private schools be "nonsectarian." *See* 1995 Wis. Act 27, § 4002. Second, the legislature increased to 15 percent in the 1996–97 school year the total percentage of MPS membership allowed to participate in the program. *See id.* at § 4003. Third, the legislature deleted the requirement that the State Superintendent conduct annual performance

evaluations and report to the legislature, and it eliminated the Superintendent's authority to conduct financial or performance evaluation audits of the program. *See id.* at §§ 4007m and 4008m.

¶ 11. Fourth, the legislature amended the original MPCP so that the State, rather than paying participating schools directly, is required to pay the aid to each participating student's parent or guardian. Under the amended MPCP, the State shall "send the check to the private school," and the parent or guardian shall "restrictively endorse the check for the use of the private school." *Id.* at § 4006m. Fifth, the amended MPCP places an additional limitation on the amount the State will pay to each parent or guardian. Under the amended MPCP, the State will pay the lesser of the MPS per student state aid under Wis. Stat. § 121.08 or the private school's "operating and debt service cost per pupil that is related to educational programming" as determined by the State. *See id.* The amended MPCP does not restrict the uses to which the private schools can put the state aid. Sixth, the legislature repealed the limitation that no more than 65 percent of a private school's enrollment consist of program participants. *See id.* at § 4003. Finally, the legislature added an "opt-out" provision prohibiting a private school from requiring "a student attending the private school under this section to participate in any religious activity if the pupil's parent or guardian submits to the teacher or the private school's principal a written request that the pupil be exempt from such activities." *Id.* at § 4008e.[3]

---

[3] The expansion of the program was set to commence in the 1995–96 school year. By the time of the injunction, more than 4,000 children previously enrolled in Milwaukee Public Schools (MPS) had applied and over 3,400 had been admitted to private schools under the amended choice program.

¶ 12. The Respondents, Warner Jackson, et al. and Milwaukee Teachers Education Association (MTEA), et al. filed two original actions in August 1995. Together the lawsuits challenged the amended MPCP under the Establishment Clause of the First Amendment; Wis. Const. art. I, § 18; art. X, § 3; art. IV, § 18; and the Wisconsin public purpose doctrine. On August 15, 1996, the National Association for the Advancement of Colored People (NAACP) filed a separate lawsuit, alleging the same claims as the first two lawsuits and adding a claim that, on its face, the amended MPCP violated the Equal Protection Clause of the Fourteenth Amendment and Wis. Const. art. I, § 1. The NAACP then filed a motion to consolidate the lawsuits. The circuit court consolidated the cases, but bifurcated the proceedings so that the equal protection claims would be heard only if the amended MPCP was upheld.

¶ 13. The State filed, under Wis. Stat. § (Rule) 809.70, a petition for leave to commence an original action, seeking from this court a declaration that the amended MPCP was constitutional. This court accepted original jurisdiction and entered a preliminary injunction staying the implementation of the amended program, specifying that the pre–1995 provisions of the original program were unaffected. Following oral argument, this court split three-to-three on the constitutional issues, dismissed the petition, and effectively remanded the case to the circuit court for further proceedings. *See State ex rel. Thompson v. Jackson*, 199 Wis. 2d 714, 720, 546 N.W.2d 140 (1996)(per curiam).

¶ 14. Following remand, the circuit court partially lifted the preliminary injunction, thereby allowing the State to implement all of the 1995 amend-

ments except the amendment allowing participation by sectarian private schools. In January 1997, the circuit court granted the Plaintiffs' motions for summary judgment, denied the State's motion for summary judgment, and invalidated the amendments to the MCPC. The circuit court held that the amended MPCP violates the religious benefits and compelled support clauses of Wis. Const. art. I, § 18, the public or local bill prohibitions of Wis. Const. art. IV, § 18, and the public purpose doctrine as the program applied to sectarian schools. The circuit court also found that the amended program did not violate the uniformity clause in Wis. Const. art. X, § 3 or the public purpose doctrine as it applied to the nonsectarian private schools. Because the circuit court invalidated the amended MPCP on state constitutional grounds, the court did not address the question whether the program violates the Establishment Clause. The State appealed from the circuit court's order, and the court of appeals, with Judge Roggensack dissenting, affirmed.

¶ 15. A majority of the court of appeals held that the amended MPCP violates the prohibition against state expenditures for the benefit of religious societies or seminaries contained in Wis. Const. art. I, § 18. The court of appeals, therefore, struck the amended MPCP in its entirety and found it unnecessary to reach the other state and the federal constitutional issues. The State appealed to this court, and we granted the State's petition for review.

¶ 16. In the circuit court, the Respondents challenged the amended MPCP under the Establishment Clause of the First Amendment; Wis. Const. art. I, § 18; art. X, § 3; art. IV, § 18; and the Wisconsin public purpose doctrine. We address each issue in turn.

¶ 17. Before we begin our analysis of the amended MPCP, we pause to clarify the issues not before this court. In their briefs and at oral argument, the parties presented information and testimony expressing positions pro and con bearing on the merits of this type of school choice program. This debate largely concerns the wisdom of the amended MPCP, its efficiency from an educational point of view, and the political considerations which motivated its adoption. We do not stop to summarize these arguments, nor to burden this opinion with an analysis of them, for they involve considerations not germane to the narrow constitutional issues presented in this case. In the absence of a constitutional violation, the desirability and efficacy of school choice are matters to be resolved through the political process. This program may be wise or unwise, provident or improvident from an educational or public policy viewpoint. Our individual preferences, however, are not the constitutional standard.

## Standard of Review

¶ 18. Procedurally, this case is before the court pursuant to the circuit court's grant of summary judgment to the Plaintiffs-Respondents. We independently review a grant of summary judgment, *see Burkes v. Klauser*, 185 Wis. 2d 308, 327, 517 N.W.2d 503 (1994), applying the same methodology as that used by the circuit court. *See, e.g., Kafka v. Pope*, 194 Wis. 2d 234, 240, 533 N.W.2d 491 (1995); *Voss v. City of Middleton*, 162 Wis. 2d 737, 748, 470 N.W.2d 625 (1991). A motion for summary judgment must be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Wis. Stat. § 802.08(2). The underlying issue in this case is

the constitutionality of the amended MPCP. The constitutionality of a statute is a question of law which we review independently, without giving deference to the decisions of the circuit court and the court of appeals. *See State v. Post*, 197 Wis. 2d 279, 301, 541 N.W.2d 115 (1995); *State v. Migliorino*, 150 Wis. 2d 513, 524, 442 N.W.2d 36 (1989).

¶ 19. Like any other duly enacted statute, the amended MPCP enjoys a strong presumption of constitutionality. All legislative acts are presumed constitutional, and every presumption must be indulged to sustain the law. *See State v. Randall*, 192 Wis. 2d 800, 824, 532 N.W.2d 94 (1995); *State ex rel. Hammermill Paper Co. v. La Plante*, 58 Wis. 2d 32, 47, 205 N.W.2d 784 (1973). Accordingly, "[it] is not enough that respondent[s] establish doubt as to the act's constitutionality nor is it sufficient that respondent[s] establish the unconstitutionality of the act as a probability. Unconstitutionality of the act must be demonstrated beyond a reasonable doubt." *La Plante*, 58 Wis. 2d at 46; *see also State v. McManus*, 152 Wis. 2d 113, 129, 447 N.W.2d 654 (1989); *Quinn v. Town of Dodgeville*, 122 Wis. 2d 570, 577, 364 N.W.2d 149 (1985).

## I. Establishment Clause

¶ 20. The first issue we address is whether the amended MPCP violates the Establishment Clause of the First Amendment to the United States Constitution. Neither the circuit court nor the court of appeals reached this issue. Upon review we conclude that the amended MPCP does not violate the Establishment Clause because it has a secular purpose, it will not

have the primary effect of advancing religion, and it will not lead to excessive entanglement between the State and participating sectarian private schools.[4]

¶ 21. The First Amendment to the United States Constitution provides in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This mandate applies equally to state legislatures by virtue of the Due Process Clause of the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Holy*

---

[4] Citing the United States Supreme Court's decision in *United States v. Salerno*, 481 U.S. 739 (1987), the Petitioners argue that since the Respondents challenge the amended Milwaukee Parental Choice Program (MPCP) as facially unconstitutional, as opposed to unconstitutional as applied to a set of particular facts, the Respondents' federal claims must fail unless they can show that under all circumstances the amended MPCP is unconstitutional. In *Salerno*, the Court noted that to succeed with a facial challenge, a party must "establish that no set of circumstances exists under which the [statute] would be valid." *Id.* at 745. The Court has not directly held that the *Salerno* standard applies to facial challenges raised under the Establishment Clause. Nor has the Court consistently applied the *Salerno* standard in other contexts. *See Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175–76 n.1 (1996) (Mem.) (citing cases in which Court did not apply *Salerno* language). In *Bowen v. Kendrick*, 487 U.S. 589 (1988), decided just one year after *Salerno*, the Court considered a facial challenge to the Adolescent Family Life Act under the Establishment Clause. Although it upheld the federal program, the *Bowen* Court did not cite to or apply the "no set of circumstances" language from *Salerno. See id.* at 627 n.1 (Blackmun, J., dissenting). We decline to apply the *Salerno* standard here. We leave to the Court the decision whether to apply the *Salerno* standard to facial challenges raised under the Establishment Clause.

*Trinity Community Sch. v. Kahl*, 82 Wis. 2d 139, 150, 262 N.W.2d 210 (1978). The Establishment Clause, therefore, prohibits state governments from passing laws which have either the purpose or effect of advancing or inhibiting religion. *See Agostini v. Felton*, — U.S. —, 117 S. Ct. 1997, 2010 (1997).

¶ 22. When assessing any First Amendment challenge to a state statute, we are bound by the results and interpretations given that amendment by the decisions of the United States Supreme Court. *See State ex rel. Holt v. Thompson*, 66 Wis. 2d 659, 663, 225 N.W.2d 678 (1975). "Ours [is] not to reason why; ours [is] but to review and apply." *State ex rel. Warren v. Nusbaum*, *(Nusbaum I)*, 55 Wis. 2d 316, 322, 198 N.W.2d 650 (1972). Our limited role is not aided by the Supreme Court's candid admission that in applying the Establishment Clause, it has "sacrifice[d] clarity and predictability for flexibility." *Committee for Pub. Educ. and Religious Liberty v. Regan*, 444 U.S. 646, 662 (1980).

¶ 23. The Supreme Court has repeatedly recognized that the Establishment Clause raises difficult issues of interpretation, and cases arising under it "have presented some of the most perplexing questions to come before [the] Court." *Committee for Pub. Educ. and Religious Liberty v. Nyquist*, 413 U.S. 756, 760 (1973); *see, e.g., Mueller v. Allen*, 463 U.S. 388, 392 (1983); *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971). We are therefore cognizant of the Court's warnings that:

> There are always risks in treating criteria discussed by the Court from time to time as 'tests' in any limiting sense of that term. Constitutional adjudication does not lend itself to the absolutes of

> the physical sciences or mathematics. . .[C]andor compels the acknowledgment that we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication.

*Tilton v. Richardson,* 403 U.S. 672, 678 (1971); *see also Mueller,* 463 U.S. at 393; *Lemon,* 403 U.S. at 612.

¶ 24. In an attempt to focus on the three main evils from which the Establishment Clause was intended to afford protection: sponsorship, financial support, and active involvement of the sovereign in religious activity, *see Walz v. Tax Commission,* 397 U.S. 664, 668 (1970), the Court has promulgated a three-pronged test to determine whether a statute complies with the Establishment Clause. *See Lemon,* 403 U.S. at 612. Under this test, a statute does not violate the Establishment Clause if (1) it has a secular legislative purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not create excessive entanglement between government and religion. *See id.* at 612–13. We must apply this three-part test to determine the constitutionality of Wis. Stat. § 119.23.[5]

---

[5] While the continued authority of the test established in *Lemon v. Kurtzman,* 403 U.S. 602 (1971), is uncertain, we have no choice but to apply it in this case. We recognize that five current United States Supreme Court Justices have questioned the continued use of the *Lemon* test. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 398 (1993) (Scalia, J., concurring). Until a majority of the Supreme Court directly holds otherwise, however, we continue to apply the *Lemon* test. *See Agostini v. Felton,* — U.S. —, 117 S. Ct. 1997, 2017 (1997) (stating that other courts should leave to the Supreme Court "the prerogative of overruling its own deci-

### a. First Prong - Secular Purpose

¶ 25. Under the first prong of the *Lemon* test, we examine whether the purpose of the state legislation is secular in nature. Our analysis of the amended MPCP under this prong of the *Lemon* test is straightforward. Courts have been "reluctan[t] to attribute unconstitutional motives to the states, particularly when a plausible secular purpose for the state's program may be discerned from the face of the statute." *Mueller*, 463 U.S. at 394–95.

¶ 26. As the court of appeals recognized, the secular purpose of the amended MPCP, as in many Establishment Clause cases, is virtually conceded. *See Jackson*, 213 Wis. 2d at 29. The purpose of the program is to provide low-income parents with an opportunity to have their children educated outside of the embattled Milwaukee Public School system. The propriety of providing educational opportunities for children of poor families in the state goes without question:

> A State's decision to defray the cost of educational expenses incurred by parents—regardless of the type of schools their children attend—evidences a purpose that is both secular and understandable. An educated populace is essential to the political and economic health of any community, and a State's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the State's citizenry is well-educated.

sions."). Unlike the Supreme Court, we cannot command this "ghoul" to return to its tomb when we wish it to do so. *See Lamb's Chapel*, 508 U.S. at 398–99 (Scalia, J., concurring).

*Mueller*, 463 U.S. at 395. The propriety of such legislative purpose, however, does not immunize the amended MPCP from further constitutional challenge. *See Nyquist*, 413 U.S. at 773–74. If the amended MPCP either has a primary effect that advances religion or if it fosters excessive entanglements between church and state, then the program is constitutionally infirm and must be struck down. *See id.* at 774.

 *b. Second Prong - Primary Effect of Advancing Religion*

 ¶ 27. Analysis of the amended program under the second prong of the *Lemon* test is more difficult. While the first prong of *Lemon* examines the legislative purpose of the challenged statute, the second prong focuses on its likely effect. A law violates the Establishment Clause if its principal or primary effect either advances or inhibits religion. *See Lemon*, 403 U.S. at 612; *see also Agostini*, 117 S. Ct. at 2010; *Mueller*, 463 U.S. at 396.

 ¶ 28. This does not mean that the Establishment Clause is violated every time money previously in the possession of a state is conveyed to a religious institution. *See Witters v. Washington Dep't of Services for the Blind*, 474 U.S. 481, 486 (1986). "The simplistic argument that every form of financial aid to church-sponsored activity violates the Religion Clauses was rejected long ago. . . ." *Tilton*, 403 U.S. at 679; *see Nusbaum I*, 55 Wis. 2d at 321 n.4. The constitutional standard is the separation of church and state. *See Zorach v. Clauson* 343 U.S. 306, 314 (1952). "The problem, like many problems in constitutional law, is one of degree." *Id.*

 ¶ 29. We begin our analysis under the second prong of the *Lemon* test by first considering the cumu-

lative criteria developed over the years and applying to a wide range of educational assistance programs challenged as violative of the Establishment Clause. *See Tilton*, 403 U.S. at 677–78. Although the lines with which the Court has sketched the broad contours of this inquiry are fine and not absolutely straight, the Court's decisions generally can be distilled to establish an underlying theory based on neutrality[6] and indirection:[7] state programs that are wholly neutral in offering educational assistance directly to citizens in a

[6] The Supreme Court has historically looked to whether a program is neutral toward religion in defining its beneficiaries. *See, e.g., Bowen*, 487 U.S. 589 (rejecting challenge to federal program neutrally providing public funds to sectarian or purely secular institutions for services relating to adolescent sexuality and pregnancy to institutions); *Roemer v. Maryland Bd. of Public Works*, 426 U.S. 736 (1976) (upholding Maryland statute that provided annual subsidies directly to qualifying colleges and universities in the state, including religiously affiliated institutions; *Hunt v. McNair*, 413 U.S. 734 (1973) (rejecting challenge to South Carolina statute providing certain benefits to all institutions of higher education in South Carolina, whether or not having a religious affiliation); *Tilton v. Richardson*, 403 U.S. 672 (1971) (approving Federal Higher Educational Facilities Act, providing grants to "all colleges and universities regardless of any affiliation with or sponsorship by a religious body"); *Board of Education v. Allen*, 392 U.S. 236 (1968) (upholding state provision of secular textbooks for both public and private schools); *Everson v. Board of Education*, 330 U.S. 1 (1947) (approving busing services equally available to both public and private school children).

[7] The Court has also focused on whether public aid that flows to religious institutions does so only as a result of "genuinely independent and private choices of the aid recipients." *Witters v. Washington Dep't of Services for Blind*, 474 U.S. 481, 487 (1986); *see, e.g., Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 842–43 (1995); *Mueller v. Allen*,

class defined without reference to religion do not have the primary effect of advancing religion. The Court has explained:

> Given that a contrary rule would lead to such absurd results, we have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit.

*Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8 (1993).

¶ 30. The Court's general principle under the Establishment Clause has, since its decision in *Everson*, been one of neutrality and indirection.[8] Writing for the majority in *Everson*, Justice Black set out the view of the Establishment Clause that still guides the

---

463 U.S. 388, 398 (1983); *Allen*, 392 U.S. at 243–44; *Everson*, 330 U.S. at 17–18.

[8] The concept of neutrality has developed as a necessary result of the interplay between the Establishment and Free Exercise Clauses of the First Amendment, "both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would clash with the other." *Walz v. Tax Commission*, 397 U.S. 664, 668–69 (1970). The Court in *Walz* explained:

> The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

*Id.* at 669.

Court's thinking today. The *Everson* Court explained that "the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' " *Everson*, 330 U.S. at 16 (quoting *Reynolds v. United States*, 98 U.S. 145, 164 (1878)). The Court tempered its statement, however, by cautioning that in maintaining this wall of separation, courts must "be sure that [they] do not inadvertently prohibit [the government] from extending its general State law benefits to all its citizens without regard to their religious belief." *Id.* at 16. Under this reasoning, the Court held that the Establishment Clause does not prohibit New Jersey from spending tax-raised funds to reimburse parents directly for the bus fares of parochial school pupils as a part of a general program under which the State pays the fares of pupils attending public and other schools. *See id.* at 17.

¶ 31. In *Nyquist*, the Court struck down on Establishment Clause grounds a New York program that, *inter alia*, provided tuition grants to parents of children attending private schools. Under the program, New York sought to assure that participating parents would continue to send their children to religion-oriented schools by relieving their financial burdens. *See Nyquist*, 413 U.S. at 783. Before striking the tuition grants, the Court distinguished on two grounds the New York statute from the New Jersey statute reviewed in *Everson*: (1) unlike the statute in *Everson*, the New York statute was non-neutral because it provided benefits solely to private schools and parents with children in private schools, *see id.* at 782 n.38; and (2) the New York statute provided financial assistance rather than bus rides, *see id.* at 781–82. The Court concluded that the fact that aid was distributed directly to parents rather than the schools, although a

factor in its analysis, did not save the statute because the effect of New York's program was "unmistakably to provide desired financial support for nonpublic, sectarian institutions." *Id.* at 783.

¶ 32. Significant to the case now before us, however, the Court in *Nyquist* specifically reserved the issue whether an educational assistance program that was both neutral and indirect would survive an Establishment Clause challenge:

> Because of the manner in which we have resolved the tuition grant issue, we need not decide whether the significantly religious character of the statute's beneficiaries might differentiate the present cases from a case involving some form of public assistance (e.g., scholarships) made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited.

*Id.* at 782 n.38. In cases following its decision in *Nyquist*, the Court has piecemeal answered this question as it has arisen in varying fact situations. *See, e.g., Mueller*, 463 U.S. 388; *Witters*, 474 U.S. 481; *Zobrest*, 509 U.S. 1; *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819; *Agostini*, 117 S. Ct. 1997.[9]

---

[9] We reject the Respondents' argument that this case is controlled by *Committee for Pub. Educ. and Religious Liberty v. Nyquist*, 413 U.S. 756 (1973). Although the tuition reimbursement program in *Nyquist* closely parallels the amended MPCP, there are significant distinctions. In *Nyquist*, each of the facets of the challenged program directed aid exclusively to private schools and their students. The MPCP, by contrast, provides a neutral benefit to qualifying parents of school-age children in Milwaukee Public Schools. Unlike the program in *Nyquist*, the only financially-qualified Milwaukee students excluded from participation in the amended MPCP are those in the fourth grade or higher who are already attending private schools. The

862

¶ 33. In *Mueller*, the Court rejected an Establishment Clause challenge to a Minnesota statute allowing taxpayers to deduct certain educational expenses in computing their state income tax, even though a majority of those deductions went to parents whose children attended sectarian schools. *See Mueller*, 463 U.S. at 401–02. "Two factors, aside from the States' traditionally broad taxing authority, informed [the *Mueller* Court's] decision." *Zobrest*, 509 U.S. at 9. First, the Court noted that, unlike the statute in *Nyquist*, the Minnesota law "permits all parents—whether their children attend public school or private—to deduct their children's educational expenses." *Mueller*, 436 U.S. at 398. Second, the Court emphasized that under Minnesota's tax deduction scheme, public funds become available to sectarian schools "only as a result of numerous private choices of individual parents of school-age children," thus distinguishing *Mueller* from other cases involving "the direct transmission of assistance from the state to the schools themselves." *Id.* at 399. The Court concluded:

> The historic purposes of the clause simply do not encompass the sort of attenuated financial benefit, ultimately controlled by the private choices of individual parents, that eventually flows to parochial schools from the neutrally available tax benefit at issue in this case.

---

amended MPCP, viewed in its surrounding context, merely adds religious schools to a range of pre-existing educational choices available to MPS children. This seminal fact takes the amended MPCP out of the *Nyquist* construct and places it within the framework of neutral education assistance programs.

*Id.* at 400. *Mueller* makes clear that "state programs that are wholly neutral in offering educational assistance to a class defined without reference to religion do not violate the second part of the [*Lemon*] test, because any aid to religion results from the private choices of individual beneficiaries." *Witters*, 474 U.S. at 490–91 (Powell, J. concurring) (footnote and citations omitted).[10]

¶ 34. The Court reaffirmed the dual importance of neutrality and indirect aid in *Witters. See Witters*, 474 U.S. 481. In *Witters*, the Court *unanimously* held that the Establishment Clause did not bar a state from issuing a vocational tuition grant to a blind person who intended to use the grant to attend a Christian college and become a pastor, missionary, or youth director.[11] The Court focused first on the program's indirect aid, finding that because the aid was paid to the student

[10] As to its discussion of the importance of *Mueller*, 463 U.S. 388, in Establishment Clause jurisprudence, Justice Powell's concurring opinion in *Witters*, 474 U.S. at 490–91, drew the support of five members of the Court. Chief Justice Burger and Justice Rehnquist joined Justice Powell's concurrence, while Justices White and O'Connor wrote separately, but agreed with Justice Powell's opinion with respect to the relevance of *Mueller. See Witters*, 474 U.S. at 490 (White, J. concurring); *id.* at 493 (O'Connor, J. concurring).

[11] On its face, the Washington educational aid program upheld in *Witters* was in all significant aspects similar to the amended MPCP. The public aid was in the form of tuition grants and was made available to disadvantaged students generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited, *see Witters*, 474 U.S. at 488; student eligibility for the aid was based on nonsectarian criteria, *see id.* at 482 n.2, and the aid was paid directly to the student who then could transmit it to the school of his or her choice, *see id.* at 488.

864

rather than the institution "[a]ny aid provided under Washington's program that ultimately flows to religious institutions does so only as a result of genuinely independent and private choices of aid recipients." *Id.* at 487.

¶ 35. As in *Mueller*, the *Witters* Court then emphasized the neutrality of the program, finding that "Washington's program is 'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited,' " and therefore "creates no financial incentive for students to undertake sectarian education." *Id.* at 487–88 (quoting *Nyquist*, 413 U.S. at 782–83 n.38). In light of these factors,[12] the Court held that Washington's program—even as applied to a student who sought state assistance so that he could become a pastor—would not

---

[12] The Court in *Witters* further distinguished the Washington program from the tuition grants in *Nyquist* by noting that in application no "significant portion of the aid expended under the Washington program as a whole will end up flowing to religious education." *Witters*, 474 U.S. at 488. The Court's consideration of the percentage of students who would likely transmit program aid to sectarian institutions is inconsistent with its prior decision in *Mueller*, where the Court specifically rejected any statistical analysis showing that in application parents of children in sectarian private schools would take the bulk of the benefits available under the program. *See Mueller*, 463 U.S. at 401. The *Mueller* Court explained: "We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law." *Id.* The Court recently reaffirmed the position it took in *Mueller*. *See Agostini*, 117 S. Ct. at 2013.

865

advance religion in a manner inconsistent with the Establishment Clause.[13] *See id.* at 489.

¶ 36. The Supreme Court applied the same logic in *Zobrest*, where it held that the Establishment Clause did not prohibit a school district from providing to a deaf student a sign-language interpreter under the Individuals with Disabilities Education Act (IDEA), even though the interpreter would be a mouthpiece for religious instruction. *See Zobrest*, 509 U.S. at 13–14. The *Zobrest* Court, basing its reasoning upon *Mueller* and *Witters*, again looked to neutrality and indirection as its guiding principles. Specifically focusing on the general availability of the statute, the Court found that the "service at issue in this case is part of a general government program that distributes benefits neutrally to any child. . .without regard to the. . .'nature' of the school the child attends." *Id.* at 10.

¶ 37. The *Zobrest* Court then looked to whether the aid was direct or indirect, explaining that "[b]y according parents freedom to select a school of their choice, the statute ensures that a government-paid interpreter will be present in a sectarian school only as result of the private decision of individual parents." *Id.* Based on these two findings, the Court concluded: "When the government offers a neutral service on the premises of a sectarian school as part of a general program that 'is in no way skewed towards religion,' it follows under our prior decisions that provision of that

---

[13] In *Witters*, the Court limited its analysis to the first two prongs of the *Lemon* test. The Court held that the Washington program had a secular purpose and that it did not have the primary effect of advancing religion. *See Witters*, 474 U.S. at 485–86, 488–89. The Court declined to address the entanglement issue and remanded the case for further analysis. *See id.* at 489 n.5, 490.

service does not offend the Establishment Clause." *Id.* (quoting *Witters*, 474 U.S. at 488).

¶ 38. In *Rosenberger*, the Supreme Court held that the Establishment Clause did not prohibit the university from funding a student organization, which otherwise would have been entitled to publication funds, merely because it published a newspaper with a Christian point of view. The Court clarified that the critical aspect of the analysis was whether the state conferred a benefit which neither inhibited nor promoted religion. *See Rosenberger*, 515 U.S. at 839. As long as the benefit was neutral with respect to religion, what the student did with that benefit, even if it was to spend all of it on religion-related expenditures, was irrelevant for purposes of analyzing whether the law or policy violated the Establishment Clause. *Id.* at 842–43.

¶ 39. Finally, in *Agostini*, the Supreme Court held that a federally funded program providing supplemental, remedial instruction on a neutral basis to disadvantaged children at sectarian schools is not invalid under the Establishment Clause when sufficient safeguards exist.[14] *See Agostini*, 117 S. Ct. at 2016. The Court explained that while the general principles used to evaluate Establishment Clause cases

---

[14]Unlike the amended MPCP, the education assistance program reviewed in *Agostini* was federally funded under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 6301 et seq. *See Agostini*, 117 S. Ct. at 2003. The program, however, was designed and implemented by a local educational agency, the Board of Education of the City of New York. *See id.* at 2003–05. Although New York City's Title I program was federally funded, we find the *Agostini* Court's analysis of that program relevant to our review of the State funded amended MPCP.

have remained unchanged, the Court's "understanding of the criteria used to assess" the inquiry has changed in recent years. *Id.* at 2010.[15] The Court reiterated that the unchanged principle under the Establishment Clause remains neutrality, and that the Court will continue to ask whether the government acts with the purpose or effect of advancing or inhibiting religion. *See id.* Writing for the Court, Justice O'Connor set out three criteria the Court has in recent years used to evaluate whether an impermissible effect exists. The aid must "not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement." *Id.* at 2016.

¶ 40. After considering these three criteria, the Court held that the program did not have the primary effect of advancing religion. The Court first concluded that placing full-time employees on parochial school campuses under this program did not result in advancing religion through indoctrination. *See id.* at 2014. The Court then considered whether the criteria by which the program identified beneficiaries created a financial incentive to undertake religious indoctrination. The Court, synthesizing the central establishment clause principle, concluded that no such incentive existed under the program: "[t]his incentive is not present, however, where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Id.* The Court also concluded that the

---

[15] In upholding New York City's Title I program, the Supreme Court in *Agostini* directly overruled its decision in *Aguilar v. Felton*, 473 U.S. 402 (1985), as well as a portion of its decision in *School Dist. of Grand Rapids v. Ball*, 473 U.S. 373 (1985).

federal program did not result in an excessive entanglement between church and state. *See id.* at 2015–16.

¶ 41. The Supreme Court, in cases culminating in *Agostini*, has established the general principle that state educational assistance programs do not have the primary effect of advancing religion if those programs provide public aid to both sectarian and nonsectarian institutions (1) on the basis of neutral, secular criteria that neither favor nor disfavor religion; and (2) only as a result of numerous private choices of the individual parents of school-age children. The amended MPCP is precisely such a program. Applying to the amended MPCP the criteria the Court has developed from *Everson* to *Agostini*, we conclude that the program does not have the primary effect of advancing religion.

¶ 42. First, eligibility for benefits under the amended MPCP is determined by "neutral, secular criteria that neither favor nor disfavor religion," and aid "is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Agostini*, 117 S. Ct. at 2014. Pupils are eligible under the amended MPCP if they reside in Milwaukee, attend public schools (or private schools in grades K–3) and meet certain income requirements. Beneficiaries are then selected on a random basis from all those pupils who apply and meet these religious-neutral criteria. Participating private schools are also selected on a religious-neutral basis and may be sectarian or nonsectarian. The participating private schools must select on a random basis the students attending their schools under the amended program, except that they may give preference to siblings already accepted in the school. In addition, under the new "opt-out" provision, the private schools cannot require the students participating in

869

the program to participate in any religious activity provided at that school.

¶ 43. Under the amended MPCP, beneficiaries are eligible for an equal share of per pupil public aid regardless of the school they choose to attend. To those eligible pupils and parents who participate, the amended MPCP provides a religious-neutral benefit—the opportunity "to choose the educational opportunities that they deem best for their children." *Davis*, 166 Wis. 2d at 532. The amended MPCP, in conjunction with existing state educational programs, gives participating parents the choice to send their children to a neighborhood public school, a different public school within the district, a specialized public school, a private nonsectarian school, or a private sectarian school.[16] As a result, the amended program is in no way "skewed towards religion." *Witters*, 474 U.S. at 488.

---

[16] Our inquiry into the constitutionality of the amended MPCP must encompass "the nature and consequences of the program viewed as a whole." *Witters*, 474 U.S. at 492 (Powell, J., concurring). According to the stipulated facts in this case, the State's system of per-pupil school financing, in which public funds follow each child, now encompasses a wide range of school choices—mainly public, but some private or religious. Numerous programs have amended the number and type of educational options available to public school students. Qualifying public school students may choose from among the Milwaukee public district schools, magnet schools, charter schools, suburban public schools, trade schools, schools developed for students with exceptional needs, and now sectarian or nonsectarian private schools participating in the amended MPCP. In each case, the programs let state funds follow students to the districts and schools their parents have chosen.

¶ 44. The amended MPCP therefore satisfies the principle of neutrality required by the Establishment Clause. As Justice Jackson explained in *Everson*:

> A policeman protects a Catholic, of course—but not because he is a Catholic; it is because he. . .is a member of our society. The fireman protects the Church school—but not because it is a Church school; it is because it is property, part of the assets of our society. Neither the fireman nor the policeman has to ask before he renders aid 'Is this man or building identified with the Catholic Church.'

*Everson*, 330 U.S. at 25 (Jackson, J., dissenting). The amended MPCP works in much the same way. A student qualifies for benefits under the amended MPCP not because he or she is a Catholic, a Jew, a Moslem, or an atheist; it is because he or she is from a poor family and is a student in the embattled Milwaukee Public Schools. To qualify under the amended MPCP, the student is never asked his or her religious affiliation or beliefs; nor is he or she asked whether the aid will be used at a sectarian or nonsectarian private school. Because it provides a neutral benefit to beneficiaries selected on religious-neutral criteria, the amended MPCP neither leads to "religious indoctrination," *Agostini*, 117 S. Ct. at 2014, nor "creates [a] financial incentive for students to undertake sectarian education." *Witters*, 474 U.S. at 488; *Zobrest*, 509 U.S. at 10. As Judge Roggensack concluded, "[t]he benefit neither promotes religion nor is hostile to it. Rather, it promotes the opportunity for increased learning by those currently having the greatest difficulty with educational achievement." *Jackson*, 213 Wis. 2d at 61.

¶ 45. Second, under the amended MPCP public aid flows to sectarian private schools only as a result of

numerous private choices of the individual parents of school-age children. Under the original MPCP, the State paid grants directly to participating private schools. As explained above, the program was amended so that the State will now provide the aid by individual checks made payable to the parents of each pupil attending a private school under the program. Each check is sent to the parents' choice of schools and can be cashed only for the cost of the student's tuition. Any aid provided under the amended MPCP that ultimately flows to sectarian private schools, therefore, does so "only as a result of genuinely independent and private choices of aid recipients." *Witters*, 474 U.S. at 487.

¶ 46. We recognize that under the amended MPCP the State sends the checks directly to the participating private school and the parents must restrictively endorse the checks to the private schools. Nevertheless, we do not view these precautionary provisions as amounting to some type of "sham" to funnel public funds to sectarian private schools. In our assessment, the importance of our inquiry here is not to ascertain the path upon which public funds travel under the amended program, but rather to determine who ultimately chooses that path. As with the programs in *Mueller* and *Witters*, not one cent flows from the State to a sectarian private school under the amended MPCP except as a result of the necessary and intervening choices of individual parents. As a result, "[n]o reasonable observer is likely to draw from [these facts] an inference that the State itself is endorsing a religious practice or belief." *Witters*, 474 U.S. at 493 (O'Connor, J., concurring); *see also Zobrest*, 509 U.S. at 9–10.

¶ 47. The amended MPCP, therefore, places on equal footing options of public and private school

872

choice, and vests power in the hands of parents to choose where to direct the funds allocated for their children's benefit. We are satisfied that the implementation of the provisions of the amended MPCP will not have the primary effect of advancing religion.[17]

### c. Third Prong - Excessive Government Entanglement

¶ 48. The final question for us to determine under the *Lemon* test is whether the amended MPCP would result in an excessive governmental entanglement. with religion.[18] Stated another way, it is necessary to determine whether "[a] comprehensive, discriminating, and continuing state surveillance will

---

[17] The Respondents also argue that the amended MPCP has the primary effect of advancing religion because a substantial percent of the program's aid will flow to sectarian schools. They point out that of the 122 private schools eligible to participate in the amended program 89 are sectarian. We find this argument unpersuasive. The Supreme Court has warned against "focusing on the money that is undoubtedly expended by the government rather than on the nature of the benefit received by the recipient." *Rosenberger*, 515 U.S. at 843. "We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law." *Mueller*, 463 U.S. at 401. The percent of program funds eventually paid to sectarian private schools is irrelevant to our inquiry.

[18] The United States Supreme Court has considered entanglement both in the course of assessing whether an aid program has an impermissible effect of advancing religion and as an independent factor under the *Lemon* test. *See Agostini*, 117 S. Ct. at 2015. Regardless of how the Court has characterized the analysis, whether a government aid program results in such entanglement has consistently been an aspect of its Establishment Clause analysis. *See id.*

inevitably be required to ensure that these restrictions [against the inculcation of religious tenets] are obeyed and the First Amendment otherwise respected." *Lemon*, 403 U.S. at 619.

¶ 49. Not all entanglements have the effect of advancing or inhibiting religion. The Court's prior holdings illustrate that total separation between church and state is not possible in an absolute sense. "Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon*, 403 U.S. at 614. Some relationship between the State and religious organizations is inevitable. *See id.* (citing *Zorach*, 343 U.S. at 312). "Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *See Agostini*, 117 S. Ct. at 2015.

■

¶ 50. The amended MPCP will not create an excessive entanglement between the State and religion. Under the amended program, the State need not, and in fact is not given the authority to impose a "comprehensive, discriminating, and continuing state surveillance" over the participating sectarian private schools. *Lemon*, 403 U.S. at 619. Participating private schools are subject to performance, reporting, and auditing requirements, as well as to applicable nondiscrimination, health, and safety obligations. Enforcement of these minimal standards will require the State Superintendent to monitor the quality of secular education at the sectarian schools participating in the plan. But this oversight already exists. In the course of his existing duties, the Superintendent currently monitors the quality of education at all sectarian private schools.

¶ 51. These oversight activities relating to conformity with existing law do not create excessive entanglement merely because they are part of the amended MPCP's requirements. *See, e.g., Mueller,* 463 U.S. at 403. As the Court held in *Hernandez v. Commissioner,* 490 U.S. 680, 696–97 (1989):

> [R]outine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no 'detailed monitoring and close administrative contact' between secular and religious bodies, does not of itself violate the nonentanglement command.

(citations omitted); *accord, Agostini,* 117 S.Ct. at 2014–16; *Board of Educ. of the Westside Community Sch. v. Mergens,* 496 U.S. 226, 253 (1990); *Hartmann v. Stone,* 68 F.3d 973 (6th Cir. 1995). The program does not involve the State in any way with the schools' governance, curriculum, or day-to-day affairs. The State's regulation of participating private schools, while designed to ensure that the program's educational purposes are fulfilled, does not approach the level of constitutionally impermissible involvement.

¶ 52. In short, we hold that the amended MPCP, which provides a neutral benefit directly to children of economically disadvantaged families on a religious-neutral basis, does not run afoul of any of the three primary criteria the Court has traditionally used to evaluate whether a state educational assistance program has the purpose or effect of advancing religion. Since the amended MPCP has a secular purpose, does not have the primary effect of advancing religion, and

does not create an excessive entanglement, it is not invalid under the Establishment Clause.[19]

## II. State Establishment Clause

¶ 53. The next question presented in this case is whether the amended MPCP violates art. I, § 18 of the Wisconsin Constitution.[20] The Respondents argue, and the court of appeals concluded, that the amended MPCP violates both the "benefits clause" and the "compelled support clause" of art. I, § 18. Upon review, we conclude that the amended MPCP violates neither provision.

¶ 54. The "benefits clause" of art. I, § 18 provides: "nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." This is Wisconsin's equivalent of the Establishment Clause of the First Amendment. *See King v. Village of Waunakee*, 185 Wis. 2d 25, 52, 517 N.W.2d 671 (1994); *Holt*, 66 Wis. 2d at 676. This court has remarked that the language of art. I, § 18, while "more specific than the terser" clauses of the First

---

[19] Since we conclude that the amended MPCP does not violate the Establishment Clause, we need not address the issue, raised by Petitioners Marquelle Miller, et al., whether excluding sectarian private schools from the program violates the Free Exercise Clause of the First Amendment.

[20] Wis. Const. art. I, § 18 provides as follows:

The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries.

876

Amendment, carries the same import, *Holt*, 66 Wis. 2d at 676; both provisions "are intended and operate to serve the same dual purpose of prohibiting the 'establishment' of religion and protecting the 'free exercise' of religion." *See State ex rel. Warren v. Nusbaum (Nusbaum II)*, 64 Wis. 2d 314, 327–28, 219 N.W.2d 577 (1974) (quoting *Nusbaum I*, 55 Wis. 2d at 332). Although art. I, § 18 is not subsumed by the First Amendment, *see State v. Miller*, 202 Wis. 2d 56, 63, 549 N.W.2d 235 (1996), we interpret and apply the benefits clause of art. I, § 18 in light of the United States Supreme Court cases interpreting the Establishment Clause of the First Amendment. *See King*, 185 Wis. 2d at 55; *American Motors Corp. v. DILHR*, 93 Wis. 2d 14, 29, 286 N.W.2d 847 (1979); *State ex rel. Wisconsin Health Facilities Auth. v. Lindner*, 91 Wis. 2d 145, 163–64, 280 N.W.2d 773 (1979).[21]

---

[21] Citing our decision in *State v. Miller*, 202 Wis. 2d 56, 549 N.W.2d 235 (1996), the Respondents assert that we are precluded from looking to federal establishment clause jurisprudence in analyzing the amended MPCP under the "benefits clause" of Wis. Const. art. I, § 18. We disagree. In *Miller*, we correctly stated that some questions arising under art. I, § 18 "cannot be fully illuminated by the light of federal jurisprudence alone, but may require examination according to the dictates of the more expansive protections envisioned by our state constitution." *Id.* at 64. In *Miller*, however, we interpreted and applied the "freedom of conscience" clause, and not the benefits clause, of art. I, § 18. *See id.* at 63, 65–66. This court has traditionally looked to federal establishment clause jurisprudence, and in particular the primary effects test, when interpreting the "for the benefit of" language in the benefits clause of art. I, § 18. *See, e.g., King v. Village of Waunakee*, 185 Wis. 2d 25, 51, 517 N.W.2d 671 (1994); *State ex rel. Wisconsin Health Facilities Auth. v. Lindner*, 91 Wis. 2d 145, 163–64, 280 N.W.2d 773 (1979); *State ex rel. Warren v. Nusbaum*, 55 Wis. 2d

¶ 55. Unlike the court of appeals, which focused on whether sectarian private schools were "religious seminaries" under art. I, § 18, we focus our inquiry on whether the aid provided by the amended MPCP is "for the benefit of" such religious institutions.[22] We have explained that the language "for the benefit of" in art. I, § 18 "is not to be read as requiring that some shadow of incidental benefit to a church-related institution brings a state grant or contract to purchase within the prohibition of the section." *Nusbaum I*, 55 Wis. 2d at 333. Furthermore, we have stated that the language of art. I, § 18 cannot be read as being "so prohibitive as not to encompass the primary-effect test." *State ex rel. Warren v. Reuter*, 44 Wis. 2d 201, 227, 170 N.W.2d 790 (1969). The crucial question, under art. I, § 18, as under the Establishment Clause, is "not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." *Nusbaum I*, 55 Wis. 2d at 333 (quoting *Tilton*, 403 U.S. at 679).

¶ 56. Applying the primary effect test developed by the Supreme Court, we have concluded above that the primary effect of the amended MPCP is not the

---

316, 333, 198 N.W.2d 650 (1972) *State ex rel. Warren v. Reuter*, 44 Wis. 2d 201, 227, 170 N.W.2d 790 (1969). We continue to do so in this case.

[22] This court has construed "religious societies" to be synonymous with religious organizations. At the time of the adoption of our constitution in 1848, the word "seminaries" was synonymous with academies or schools. *See State ex rel. Weiss v. District Board*, 76 Wis. 177, 215, 44 N.W. 967 (1890). Sectarian private schools, therefore, constitute "religious seminaries" within the meaning of art. I, § 18. *See State ex rel. Reynolds v. Nusbaum*, 17 Wis. 2d 148, 156, 115 N.W.2d 761 (1962).

advancement of a religion. We find the Supreme Court's primary effect test, focusing on the neutrality and indirection of state aid, is well reasoned and provides the appropriate line of demarcation for considering the constitutionality of neutral educational assistance programs such as the amended MPCP. Since the amended MPCP does not transgress the primary effect test employed in Establishment Clause jurisprudence, we also conclude that the statute is constitutionally inviolate under the benefits clause of art. I, § 18.

¶ 57. This conclusion is not inconsistent with Wisconsin tradition or with past precedent of this court. Wisconsin has traditionally accorded parents the primary role in decisions regarding the education and upbringing of their children. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Wisconsin Indus. Sch. for Girls v. Clark County*, 103 Wis. 651, 79 N.W.2d 422 (1899); *accord Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390 (1923). This court has embraced this principle for nearly a century, recognizing that: "parents as the natural guardians of their children [are] the persons under natural conditions having the most effective motives and inclinations and being in the best position and under the strongest obligations to give to such children proper nurture, education, and training." *Wisconsin Indus. Sch. for Girls*, 103 Wis. at 668–69.

¶ 58. In this context, this court has held that public funds may be placed at the disposal of third parties so long as the program on its face is neutral between sectarian and nonsectarian alternatives and the transmission of funds is guided by the independent decisions of third parties, *see, e.g., State ex rel. Atwood v. Johnson*, 170 Wis. 218, 175 N.W.2d 589 (1919), and

that public funds generally may be provided to sectarian educational institutions so long as steps are taken not to subsidize religious functions, *see, e.g., Nusbaum II*, 64 Wis. 2d 314.

¶ 59. In *Nusbaum II*, this court upheld a state program that provided educational benefits without charge to students with exceptional educational needs. Where public resources were inadequate to attend to a student's exceptional needs, the State could under the program directly contract with private sectarian institutions to provide the necessary services. *See Nusbaum II*, 64 Wis. 2d at 320–21. Reviewing the program, the *Nusbaum II* court emphasized the neutral process by which students were chosen to participate in the program, *see id.* at 320, and the great lengths to which the legislature had gone to make sure that the inculcation of religious tenets did not take place, *see id.* at 325. Applying the primary effect test of *Lemon*, the court concluded that the program violated neither the Establishment Clause nor art. I, § 18. *See id.* at 322, 329.

¶ 60. In *Atwood,* 170 Wis. 218, this court upheld a program, much like the amended MPCP, that provided neutral educational assistance. The *Atwood* court considered the constitutionality of educational benefits for returning veterans that encompassed paying the cost of schooling, at any high school or college, including religious schools. Under that program, a student could choose a school, and the State directly paid to the schools the actual increased cost of operation attributed to the additional students. Upholding the program under art. I, § 18, the court concluded:

> The contention that financial benefit accrues to religious schools from [this program] is equally untenable. Only actual increased cost to such

schools occasioned by the attendance of benefi-
ciaries is to be reimbursed. They are not enriched by
the service they render. Mere reimbursement is not
aid.

*Id.* at 263–64.

¶ 61. In concluding that the amended MPCP vio-
lated art. I, § 18, the court of appeals relied heavily on
this court's decisions in *State ex rel. Weiss v. District
Board*, 76 Wis. 177, 44 N.W. 967 (1890) and *State ex rel.
Reynolds v. Nusbaum*, 17 Wis. 2d 148, 156, 115 N.W.2d
761 (1962). We find the court's reliance was misplaced.

¶ 62. In *Weiss*, the court held that reading of the
King James version of the Bible by students attending
public school violated the religious benefits clause of
art. I, § 18. Although the court's reasoning in *Weiss*
may have differed from ours, its holding is entirely
consistent with the primary effects test the Supreme
Court has developed and we apply today. Requiring
public school students to read from the Bible is neither
neutral nor indirect. The Edgerton schools reviewed in
*Weiss* were directly supported by public funds, and the
reading of the Bible was anything but religious-neu-
tral. The program considered in *Weiss* is far different
from the neutral and indirect aid provided under the
amended MPCP. The holding in *Weiss*, therefore, does
not control our inquiry in this case.

¶ 63. In *Reynolds*, 17 Wis. 2d 148, the court
struck down a publicly supported transportation pro-
gram it perceived was designed to benefit parochial
schools. In reaching its conclusion, the *Reynolds* court
applied a stricter standard under art. I, § 18 than that
used by the Supreme Court under the Establishment
Clause. *See id.* at 165. This court has since rejected
applying this stricter standard in cases arising under
the benefits clause of art. I, § 18. *See, e.g., Lindner*, 91

881

Wis. 2d at 163–64; *Nusbaum II*, 64 Wis. 2d at 328; *Reuter*, 44 Wis. 2d at 227. The court's analysis and conclusion in *Reynolds* are therefore not dispositive in our inquiry here.

¶ 64. The Respondents additionally argue that the amended MPCP violates the "compelled support clause" of art. I, § 18. The compelled support clause provides "nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry without consent. . . ." The Respondents assert that since public funds eventually flow to religious institutions under the amended MPCP, taxpayers are compelled to support places of worship against their consent. This argument is identical to the Respondents' argument under the benefits clause. We will not interpret the compelled support clause as prohibiting the same acts as those prohibited by the benefits clause. Rather we look for an interpretation of these two related provisions that avoids such redundancy. *See Kungys v. United States*, 485 U.S. 759, 778 (1988).

¶ 65. In *Holt*, 66 Wis. 2d 659, this court interpreted the compelled support provision and applied it to a state program under which public school children were released from school so that they could attend religious centers for religious instruction. *See id.* at 676–77. In the context provided in *Holt*, the court interpreted the compelled support clause to prohibit the state from forcing or requiring students to attend or participate in religious instruction. *See id.* at 676. Under this interpretation, the court upheld the program, finding that the children participating in the program did so only by choice and that, although proof of attendance at the religious instruction was required, the program's requirements were directed at prevent-

ing deception rather than compelling attendance. *See id.* "Compulsion to attend is not, initially or subsequently, a part of the program." *Id.* at 677. The court therefore rejected the compelled support challenge.

¶ 66. Applying in this case the interpretation of the compelled support clause provided in *Holt*, we conclude that the amended MPCP does not violate that constitutional provision. Like the program in *Holt*, the amended MPCP does not require a single student to attend class at a sectarian private school. A qualifying student only attends a sectarian private school under the program if the student's parent so chooses. Nor does the amended MPCP force participation in religious activities. On the contrary, the program prohibits a sectarian private school from requiring students attending under the program to participate in religious activities offered at such school. The choice to participate in religious activities is also left to the students' parents. Since the amended MPCP neither compels students to attend sectarian private schools nor requires them to participate in religious activities, the program does not violate the compelled support clause of art. I, § 18.

¶ 67. In assessing whether the amended MPCP violates Wis. Const. art. IV, § 18, art. X, § 3, or the Wisconsin public purpose doctrine, we rely heavily on our analyses and conclusions in *Davis*, 166 Wis. 2d 501. In *Davis*, the school choice opponents attacked the original MPCP under a barrage of arguments similar to those raised by the Respondents in this case. Specifically, we concluded in *Davis* that the original MPCP did not violate art. IV, § 18, art. X, § 3, or the public purpose doctrine. In this case, we limit our analysis to determining whether the amendments made to the

original MPCP change either the analyses we relied upon or the conclusions we reached in *Davis*. Upon review we conclude that they do not.

## III. Private or Local Bill

¶ 68. The third issue presented in this case is whether the amended MPCP is a private or local bill which was enacted in violation of the procedural requirements mandated by Wis. Const. art. IV, § 18.

¶ 69. Article IV, § 18 of the Wisconsin Constitution states in full: "No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." This constitutional provision addresses the form in which private or local legislation is enacted and not the substance of that legislation. *See Davis*, 166 Wis. 2d at 526. As we have explained, art. IV, § 18 serves three underlying purposes:

> 1) to encourage the legislature to devote its time to the state at large, its primary responsibility; 2) to avoid the specter of favoritism and discrimination, a potential which is inherent in laws of limited applicability; and 3) to alert the public through its elected representatives to the real nature and subject matter of legislation under consideration.

*Milwaukee Brewers v. DHSS*, 130 Wis. 2d 79, 107–08, 387 N.W.2d 254 (1986). "The requirements of art. IV, § 18 are prescribed to ensure accountability of the legislature to the public and to 'guard against the danger of legislation, affecting private or local interests, being smuggled through the legislature.' " *Davis*, 166 Wis. 2d at 519 (quoting *Milwaukee County v. Isenring*, 109 Wis. 9, 23, 85 N.W. 131 (1901). The question here is whether

the amended MPCP comes within the purview of art. IV, § 18.

¶ 70. In *Davis*, we set forth a two-fold analysis for assessing whether a bill or statute violates Wis. Const. art. IV, § 18:

> We must first address whether the process in which the bill was enacted deserves a presumption of constitutionality. Second, we must address whether the bill is private or local. If the bill is found to be private or local, then the requirements of art. IV, § 18 apply; namely, that the legislation must be a single subject bill and the title of the bill must clearly reflect the subject.

*Id.* at 520. We review the amended MPCP under this two-fold analysis.

¶ 71. Thus, our first inquiry is whether the process by which the amended MPCP was enacted deserves the presumption of constitutionality. Where the legislature is alleged to have violated a constitutional provision mandating the procedure by which bills must pass, we will not indulge in a presumption of constitutionality, "for to do so would make a mockery of the procedural constitutional requirement." *City of Brookfield v. Milwaukee Sewerage Comm'n*, 144 Wis. 2d 896, 912–13 n.5, 426 N.W.2d 591 (1988); *see City of Oak Creek v. DNR*, 185 Wis. 2d 424, 437, 518 N.W.2d 276 (Ct. App. 1994). "Nonetheless, this court may indulge the presumption of constitutionality where it is evident that the legislature did adequately consider or discuss the legislation in question, even where such legislation was passed as part of a voluminous bill." *Oak Creek*, 185 Wis. 2d at 437; *see Davis*, 166 Wis. 2d at 521–23.

¶ 72. We find no evidence in this case that the amended MPCP was smuggled or logrolled through the legislature. On the contrary, the record establishes that the legislature "intelligently participate[d] in considering" the amended MPCP. *Davis*, 166 Wis. 2d at 523 (quoting *Brookfield*, 144 Wis. 2d at 912 n.5). According to the Agreed Upon Statement of Facts in this case, the amendments to the original MPCP were proposed by the Governor as a portion of the 1995–1997 biennial budget bill, which was referred to the Joint Committee on Finance. During the spring of 1995, the proposed amendments to the original MPCP, along with other aspects of the biennial budget, were discussed at public hearings throughout the state.[23] The proposed amendments were then debated, specifically amended, and in June 1995, adopted by the Joint Committee on Finance. The Assembly then debated, specifically amended, held a public hearing on, and passed the proposed amendments as part of the biennial budget bill. The biennial budget bill was then referred to the Senate. The Senate held public hearings on, debated, and concurred in the proposed amendments to the original MPCP. On July 26, 1995, the amended MPCP was enacted as a portion of the 1995–97 State of Wisconsin Biennial Budget, 1995 Wis. Act 27.

¶ 73. Under the stipulated facts of this case, we find it evident that the amended MPCP was not smuggled through the legislature, but rather was forged in

---

[23] Public hearings on the proposed amendments to the original MPCP and other aspects of the biennial budget bill were held in the City of Milwaukee on April 3, 1995, in Cedarburg on March 21, 1995, in Madison on March 27, 1995, in Portage on March 23, 1995, and in River Falls on March 30, 1995. *See* Record Document 211A at 7.

the deliberative kiln of public debate. The legislature adequately considered and discussed the amended MPCP, even though the proposed amendments were ultimately enacted as part of a multi-subject bill. We therefore find it proper to apply a presumption of constitutionality to the process in which the amended MPCP was enacted into law.

■

¶ 74. Our next line of inquiry is whether the amended program is "private or local" legislation. *See Davis*, 166 Wis. 2d at 524. The term "private or local" is not defined in the constitution. Legislation that is geographically specific will not automatically be considered private or local where the general subject matter of the legislation relates to a state responsibility, that is when "the subject thereof is such that the state itself has an interest therein as proprietor, or as trustee, or in its governmental capacity, for the benefit or in the interest of the general public." *Milwaukee Brewers*, 130 Wis. 2d at 111 (citations and internal quotations omitted).

¶ 75. To assess whether the amended MPCP is private or local legislation, we apply the test this court created in *Brookfield. See Davis*, 166 Wis. 2d at 527.[24] The *Brookfield* test comprises five elements:

---

[24] In assessing whether the amended MPCP is private or local legislation, we apply the five-factor test created in *City of Brookfield v. Milwaukee Sewerage Dist.*, 144 Wis. 2d 896, 426 N.W.2d 591 (1988), because the amended MPCP is not specific on its face, involves classifications, does not violate Wis. Const. art. IV, § 31, but allegedly runs afoul of art. IV, § 18. *See id.* at 912; *see also Davis v. Grover*, 166 Wis. 2d 501, 525, 480 N.W.2d 460 (1992).

> First, the classification employed by the legislature must be based on substantial distinctions which make one class really different from another.
>
> Second, the classification adopted must be germane to the purpose of the law.
>
> Third, the classification must not be based on existing circumstances only. Instead, the classification must be subject to being open, such that other cities could join the class.
>
> Fourth, when a law applies to a class, it must apply equally to all members of the class.
>
> . . . [F]ifth, the characteristics of each class should be so far different from those of the other classes so as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

*Davis*, 166 Wis. 2d at 526 (quoting *Brookfield*, 144 Wis. 2d at 907–09).

¶ 76. In *Davis*, we held that the original MPCP satisfied all five elements of the *Brookfield* test and therefore was not private or local legislation subject to the procedural requirements in art. IV, § 18. *See Davis*, 166 Wis. 2d at 537. The 1995 amendments to the original MPCP did not change the program in any way that would alter our analyses or conclusions in *Davis* as to the first, third, fourth, and fifth elements of the *Brookfield* test.[25] In this case, the Respondents assert only

---

[25] In all aspects relevant to the first, third, fourth, and fifth elements of the *Brookfield* test, the amended MPCP is identical to the original MPCP upheld in *Davis*. First, like the original program, the amended MPCP involves a classification recognized and accepted by this court: cities of the first class. Second, since other cities can join this class, the classification is subject to being open. Third, the amended MPCP, by its terms, applies

that, as a result of the changes made to the program since *Davis*, the classification imposed by the amended MPCP does not satisfy the second element of the *Brookfield* test. We therefore limit our discussion to the second element of the *Brookfield* test.

¶ 77. The second element of the *Brookfield* test requires that "the classification adopted must be germane to the purpose of the law." *Brookfield*, 144 Wis. 2d at 907, 917–20. In *Davis*, we concluded that the original MPCP satisfied this element because it was "an experiment intended to address a perceived problem of inadequate educational opportunities for disadvantaged children." *Davis*, 166 Wis. 2d at 530, 535. We there explained:

> [T]he classification of first class cities is germane to the purpose of the law. Clearly, improving the quality of education and educational opportunities in Wisconsin is a matter of statewide importance. The best location to experiment with legislation aimed at improving the quality of education is in a first class city, a large urban area where the socio-economic and educational disparities are greatest and the private educational choices are most abundant.

*Id.* at 535.

¶ 78. The Respondents contend that our holding in *Davis* does not control the determination in this case because the amended MPCP is no longer experimental in nature and therefore the classification of cities of the first class is no longer germane to the purpose of that

---

equally to all qualifying cities. Finally, the characteristics of cities of the first class are sufficiently different from those of other classes of cities so to suggest at least the propriety of substantially different legislation. *See Davis*, 166 Wis. 2d at 526–37.

law. We disagree. Despite some amendments, the program has retained its experimental character. In concluding that the original MPCP was experimental legislation, the *Davis* court focused on two characteristics of the program: its limited participation (one percent of MPS membership) and its data compilation and reporting provisions. *See id.* at 533–34. The amended MPCP has retained these two characteristics.

¶ 79. First, like the original program, the amended MPCP is not an abandonment of the public school system. With the 1995 amendments, the legislature expanded the program by increasing to 15 percent of total MPS membership the number of financially disadvantaged students eligible to attend private schools under the amended MPCP. Even though this represents a substantial increase in the total number of students eligible to participate, the program still affects only a small portion of MPS membership. No less than 85 percent of the MPS membership will be unaffected by the amended MPCP. Although it provides a somewhat larger view, the amended MPCP still provides but a "window of opportunity to test the effectiveness of an alternative to the MPS." *Id.* at 533.[26]

¶ 80. Second, like the original program, the amended MPCP continues to allow the State to measure the effects of choice and competition on education. *See Davis*, 166 Wis. 2d at 533. With the 1995 amend-

---

[26] Rather than destroying the program's experimental nature, the expansion of the program to a larger sample of students may make it easier for researchers to measure the effectiveness of this experiment in education. *See* Jay P. Greene, Paul E. Peterson, & Jiangtao Du, *The Effectiveness of School Choice in Milwaukee: A Secondary Analysis of Data From The Program's Evaluation,* at 26–27.

ments, the legislature deleted some of the monitoring requirements from the original plan. Specifically, the legislature deleted the requirement that the State Superintendent conduct annual performance evaluations and report to the legislature, and it eliminated the Superintendent's authority to conduct financial or performance evaluation audits of the program. *See* 1995 Wis. Act 27 at §§ 4007m and 4008m. The amended MPCP, however, requires the Legislative Audit Bureau to conduct a financial and performance evaluation of the program and to submit it to each house of the legislature by January 15, 2000. *See id.* at § 4008s.

¶ 81. The mere fact that the legislature has chosen to conduct one evaluation in the year 2000 rather than on an annual basis does not destroy the experimental nature of the amended MPCP. As we explained in *Davis*, "[t]his experiment tests a theory of education." *Id.* at 534. The effects of this experiment will be measured not only by the test scores or graduation rates of those students to whom "life preservers" have been thrown,[27] but also by the education those students who remain in MPS receive. Nor will the success or failure of this experiment be measured by focusing solely on those students participating in the program, but also by considering whether parental choice spurs competitiveness and innovation within the public education system. The legislature has provided a reasonable process by which to review the effects of the amended MPCP. Article IV, § 18 does not dictate a

---

[27] *See Davis*, 166 Wis. 2d at 547 (Ceci, J., concurring) ("The Wisconsin legislature. . .has attempted to throw a life preserver to those Milwaukee children caught in the cruel riptide of a school system floundering upon the shoals of poverty, status-quo thinking, and despair.").

particular timetable for such review. We therefore express no opinion whether yearly evaluations or one evaluation at the end of four years will provide a more accurate or more cost-effective measure of the amended MPCP's effects.

¶ 82. In short, we conclude that the amended MPCP, like the original program, is experimental legislation intended to address a perceived problem in the quality of education and educational opportunities in Wisconsin. The best location to experiment with such a program is in a city of the first class, where "socioeconomic and educational disparities. . .are most abundant." *Id.* at 535. The amended MPCP's classification of cities of the first class is therefore germane to the purpose of the law. The second element of the *Brookfield* test is satisfied. Accordingly, we hold that the amended MPCP is not a private or local bill within the meaning of Wis. Const. art. IV, § 18, and thus not subject to its procedural requirements.

## IV. Uniformity Clause

¶ 83. The fourth issue presented in this case is whether the amended MPCP violates the uniformity provision of Wis. Const. art. X, § 3. The court of appeals did not reach this issue, and the circuit court concluded that the amended program does not violate the uniformity clause.

¶ 84. Wisconsin Constitution art. X, § 3 states:

> The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed therein;. . . .

¶ 85. The Respondents first argue that the amendments to the program, primarily the removal of funding limits that prevented a private school from operating solely on public funds, effectively transforms private schools participating in the amended MPCP into district schools subject to the nonsectarian clause of art. X, § 3. As in *Davis*, the key to this argument is whether private schools, by participating in the amended MPCP, become "district schools" for the purposes of the uniformity clause. We conclude that they do not.

¶ 86. Relying on the classification in Wis. Stat. § 115.01(1) and on the fact that a private school could receive 100 percent of its tuition from public funds, the Respondents contend that private schools participating in the amended MPCP will become "public schools" because they will be "elementary and high schools supported by public taxation." In *Davis* this court squarely rejected the argument that private schools receiving state funds under the original MPCP were "district schools" to which the uniformity requirement applies. *See Davis*, 166 Wis. 2d at 538. The court noted that the original MPCP explicitly referred to participating schools as "private schools" and observed that "[i]n no case have we held that the mere appropriation of public monies to a private school transforms that school into a public school." *Id.* at 539–40.

¶ 87. We apply the same reasoning in this case. Like the original MPCP, the amended program expressly refers to participating schools as "private schools." The term "private school" is defined by statute to include those private institutions satisfying the requirements of Wis. Stat. § 118.165 or determined to be a private school by the State Superintendent under Wis. Stat. § 118.167. *See* Wis. Stat. § 115.001(3r). "We

assume that the legislature was aware of this statutory meaning and intended to use 'private school'. . .as a statutory term of art." *Davis,* 166 Wis. 2d at 538. As in *Davis,* we conclude that the mere appropriation of public monies to a private school does not transform that school into a district school under art. X, § 3. This conclusion is not affected by the amount of public funds a private school receives.

¶ 88. The Respondents also argue that art. X, § 3 prohibits the State from diverting students and funds away from the public school system. Article X, § 3, the Respondents contend, requires that the district schools be the only system of state-supported education. This argument too was raised and specifically rejected in *Davis. See Davis,* 166 Wis. 2d at 538–40.

¶ 89. In *Davis,* the choice opponents argued that the explicit requirement in art. X, § 3 that the State establish public district schools implicitly prohibits the legislature from spending public funds to support any schools other than district schools. As a dissenting opinion argued: "the constitutional system of public education was intended to be the only general school instruction to be supported by taxation." *Davis,* 166 Wis. 2d at 558 (Abrahamson, J., dissenting). The court, relying on precedent of this court, rejected that contention. *See id.* at 537–38 (citing *State ex rel. Comstock v. Joint Sch. Dist. No. 1,* 65 Wis. 631, 636–37, 27 N.W. 829 (1886) and *Kukor v. Grover,* 148 Wis. 2d 469, 496–97, 436 N.W.2d 568 (1989)); *accord Buse v. Smith,* 74 Wis. 2d 550, 565, 247 N.W.2d 141 (1976); *Reuter,* 44 Wis. 2d at 221; *City of Manitowoc v. Town of Manitowoc Rapids,* 231 Wis. 94, 98, 285 N.W. 403 (1939). Applying the reasoning of *Comstock* and *Kukor,* the court concluded that art. X, § 3 provides not a ceiling but a floor

upon which the legislature can build additional opportunities for school children in Wisconsin:

> The uniformity clause clearly was intended to assure certain minimal educational opportunities for the children of Wisconsin. It does not require the legislature to ensure that all of the children in Wisconsin receive a free uniform basic education. Rather, the uniformity clause requires the legislature to provide the opportunity for all children in Wisconsin to receive a free uniform basic education.

*Davis*, 166 Wis. 2d at 539.

¶ 90. Similar to the original MPCP upheld in *Davis*, the amended MPCP in no way deprives any student of the opportunity to attend a public school with a uniform character of education. By enacting the amended MPCP, the State has merely allowed certain disadvantaged children to take advantage of alternative educational opportunities in addition to those provided by the State under art. X, § 3. The students participating in the amended MPCP do so by choice and may withdraw at any time and return to a public school. "[W]hen the legislature has provided for each [ ] child the privileges of a district school, which he or she may freely enjoy, the constitutional requirement in that behalf is complied with." *Comstock*, 65 Wis. at 636–37. As in *Davis*, we conclude that the legislature has done so here. The amended MPCP merely reflects a legislative desire to do more than that which is constitutionally mandated.

¶ 91. We therefore hold that the sectarian private schools participating in the MPCP do not constitute "district schools" for the purposes of the uniformity clause. We also reaffirm the position that the

legislature has fulfilled its constitutional duty to provide for the basic education of our children. The State's experimental attempts to improve upon that foundation in no way deny any student the opportunity to receive the basic education in the public school system. *See Davis*, 166 Wis. 2d at 539.

## V. Public Purpose Doctrine

¶ 92. The fifth issue presented in this case is whether the amended MPCP violates Wisconsin's public purpose doctrine. The court of appeals did not reach this issue, and the circuit court concluded that it does.

¶ 93. The public purpose doctrine, although not recited in any specific clause in the state constitution, is a well-established constitutional doctrine. *See Hopper v. City of Madison*, 79 Wis. 2d 120, 128, 256 N.W.2d 139 (1977). As this court stated in *State ex rel. Warren v. Nusbaum*, 59 Wis. 2d 391, 414, 208 N.W.2d 780 (1973), "[p]ublic funds may be expended for only public purposes. An expenditure of public funds for other than a public purpose would be abhorrent to the constitution of Wisconsin."

¶ 94. Under the public purpose doctrine, "[w]e are not concerned with the 'wisdom, merits or practicability of the legislature's enactment.' Rather we are to determine whether a 'public purpose can be conceived which might reasonably be deemed to justify or serve as a basis for the expenditure.'" *Millers Nat'l Ins. v. City of Milwaukee*, 184 Wis. 2d 155, 175–76, 516 N.W.2d 376 (1994) (quoting *Hopper*, 79 Wis. 2d at 129) (internal citation omitted). "A court can conclude that no public purpose exists only if it is 'clear and palpable' that there can be no benefit to the public." *La Plante*, 58 Wis. 2d at 56 (citation omitted).

¶ 95.　No party disputes that education constitutes a valid public purpose, or that private schools may be employed to further that purpose. Education ranks at the apex of a state's function. *See Yoder*, 406 U.S. at 213; *Brown v. Board of Education*, 347 U.S. 483, 493 (1954). This court has long recognized that equal educational opportunities are a fundamental right, *see, e.g., Buse*, 74 Wis. 2d 550, and that the State has broad discretion to determine how best to ensure such opportunities. *See Davis*, 166 Wis. 2d at 541–44; *Kukor*, 148 Wis. 2d 492–94; *Atwood*, 170 Wis. at 263–64.

¶ 96.　The parties in this case dispute only whether the private schools participating in the amended program are under proper governmental control and supervision, as required by *Wisconsin Industrial School for Girls*, 103 Wis. at 668. *See Davis*, 166 Wis. 2d at 541–42; *Reuter*, 44 Wis. 2d at 216. The Respondents allege that the amended MPCP lacks sufficient control and accountability to secure a public interest. They note that some of the reporting requirements in the original MPCP upon which the court in *Davis* focused have been eliminated by amendment.

¶ 97.　The control and accountability requirements imposed under the public policy doctrine are not demanding. *See Reuter*, at 216. In *Davis* we explained:

> To test the propriety of expending public monies to a private institution for public purposes, this court must determine whether the private institution is under reasonable regulations for control and accountability to secure public interests. 'Only such control and accountability as is reasonably necessary under the circumstances to attain the public purpose is required.'

897

*Davis*, 166 Wis. 2d at 542 (quoting *Reuter*, 44 Wis. 2d at 216)(internal citation omitted). We therefore must determine only whether the amended MPCP includes control and accountability requirements reasonably necessary to secure the public purpose to which it is directed.

¶ 98. The control and accountability arguments raised by the Respondents in this case were largely handled by this court in *Davis*. *See id.* at 541–45. In *Davis,* we upheld the original MPCP under a public purpose doctrine challenge. As in this case, the choice opponents in *Davis* argued that the controls in the original MPCP were woefully inadequate. We there concluded that the statutory controls applicable to private schools coupled with parental choice sufficed to ensure that the public purpose was met. *See id.* at 546.

¶ 99. Similarly, in *Reuter* this court held that public appropriations to a private medical school did not violate the public purpose doctrine where the circumstances presented "no frivolous pretext for giving money to a private school but the using of a private school to attain a public purpose." *Reuter*, 44 Wis. 2d at 214. The court noted that the private school was not regulated to the same extent as public schools, but it concluded that:

> A private agency cannot and should not be controlled as two-fistedly as a government agency. . . .A private agency is selected to aid the government because it can perform the service as well or better than the government. We should not bog down private agencies with unnecessary government control. . . .We do not think it is necessary or required by the constitution that the state must legally be able to control the agency corporation in order to find sufficient regulations for control and

> accountability. The state is not interested in controlling the day-to-day operation of the medical school but in its end product.

*Id.* at 217.

¶ 100. In light of the standard applied in *Davis* and *Reuter*, we conclude that control and accountability safeguards in the amended MPCP are sufficient to ensure that the program fulfills its purpose of promoting education. First, the private schools participating in the amended MPCP continue to be subject to the instruction, curriculum, and attendance regulations that govern all private schools. *See* Wis. Stat. §§ 118.165(1) and 118.167; *Davis*, 166 Wis. 2d at 543. Second, the amended MPCP continues to require an annual financial audit by the State Superintendent and provides for an additional review by the Legislative Audit Bureau covering both financial and performance evaluations of the plan. *See* Wis. Stat. § 119.23(7)(am), (9). Finally, as in *Davis*, the schools participating in the amended MPCP are also subject to the additional checks inherent in the notion of school choice. "Control is also fashioned with the [plan] in the form of parental choice. . . .If the private school does not meet the parents' expectations, the parents may remove the child from the school and go elsewhere." *Davis*, 166 Wis. 2d at 544. These combined elements of the amended MPCP are more than sufficient control and accountability measures to ensure that the program serves the public purpose to which it is directed.

¶ 101. The Respondents additionally argue that the amended MPCP violates the public purpose doctrine because it funds religious education and other religious activities that are not public purposes. The Respondents argue, and the circuit court held, that because public funds flow to religious private schools,

899

the program does not serve a public purpose. We find this argument unfounded. We have never interpreted the public purpose doctrine to incorporate an anti-establishment principle. That the State has chosen to include sectarian private schools in the amended MPCP does not render the program's public purpose invalid. Whether the State may adopt such an approach is an issue we resolve under the provisions of art. I, § 18.

¶ 102. We therefore hold that the amended MPCP does not violate the public purpose doctrine because it fulfills a valid public purpose, and it contains sufficient and reasonable controls to attain its public purpose.

## VI. NAACP's Equal Protection Claim

¶ 103. In addition to the challenges raised by the Respondents, the NAACP alleges that the amended MPCP violates the equal protection clauses of the Fourteenth Amendment to the United States Constitution and art. I, § 1 of the Wisconsin Constitution.[28]

---

[28] The Fourteenth Amendment to the United States Constitution provides "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The functional equivalent of this clause is found in Wis. Const. art. I, § 1: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." As we noted in *State ex rel. Sonneborn v. Sylvester*, 26 Wis. 2d 43, 49–50, 132 N.W.2d 249 (1965) even though art. I, § 1 is based on the Declaration of Independence, "there is no substantial difference" between its equal protection

Although this issue was not addressed by the circuit court or the court of appeals, it was briefed and argued before this court by the NAACP. Upon review, we conclude that the NAACP's facial equal protection claim must fail as a matter of law.

¶ 104. It is the often repeated rule in this state that issues not considered by the circuit court will not be considered for the first time on appeal. *See Binder v. City of Madison*, 72 Wis. 2d 613, 618, 241 N.W.2d 613 (1976); *Wirth v. Ehly*, 93 Wis. 2d 433, 443, 287 N.W.2d 140 (1980). This rule is not absolute, however, and exceptions are made. *See Binder*, 72 Wis. 2d at 618; *Cords v. State*, 62 Wis. 2d 42, 54, 214 N.W.2d 405 (1974). In this case, all the issues raised are legal questions that can be disposed of "based upon a consideration of the record." *State v. Conway*, 34 Wis. 2d 76, 83, 148 N.W.2d 721 (1967); *see Smith v. Katz*, No. 96–1998, op. at 9 (S. Ct. June 2, 1998); *Wirth*, 93 Wis. 2d at 443–44. In the interests of judicial economy and the finality of this decision, we exercise our discretion to decide the entire case while it is before us. *See Carlson & Erickson Builders v. Lampert Yards*, 190 Wis. 2d 650, 656, 529 N.W.2d 905 (1995); *Burger v. Burger*, 144 Wis. 2d 514, 518, 424 N.W.2d 691 (1988); *Wirth*, 93 Wis. 2d at 444. We therefore proceed to address the NAACP's equal protection claim.

¶ 105. The Fourteenth Amendment guarantee of equal protection provides "a right to be free from invidious discrimination in statutory classifications and other governmental activity." *Harris v. McRae*, 448

and due process provisions and that of the Fourteenth Amendment. Thus, in our analysis of the NAACP's equal protection argument, the two constitutional provisions are treated as equivalent. *See id.* at 50.

U.S. 297, 322 (1980). The central purpose of the Equal Protection Clause is to prevent "official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). To show racial discrimination in violation of this guarantee, a plaintiff must show that a statute was enacted with a purpose or intent to discriminate. *See id.* at 242; *see also Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–265 (1977). The Supreme Court has adhered to this principle in school desegregation cases: "that there are both predominately black and predominately white schools in a community is not alone violative of the Equal Protection Clause." *Davis*, 426 U.S. at 240 (citing *Keyes v. School Dist. No. 1*, 413 U.S. 189 (1973)). Even accepting the NAACP's allegations as true and construing them liberally, *see Scarpaci v. Milwaukee County*, 96 Wis. 2d 663, 669, 292 N.W.2d 816 (1980), we conclude that the NAACP's allegations do not support a claim of a violation of equal protection.

¶ 106. In its facial challenge, the NAACP has not alleged, and we cannot reasonably infer, that the State acted with an intent to discriminate on the basis of race when the State enacted the amended MPCP. Although the NAACP generally concludes that the purposes of the MPCP were expanded to include segregation of the races in the MPS, the NAACP does not allege that the State enacted the amended MPCP with the intent to discriminate based on race. Nor does the NAACP allege that the private schools participating in the amended program have excluded students on the basis of race or have in any other way intentionally discriminated against students based on race.[29]

---

[29] In its brief and at oral argument, the NAACP relied heavily on *Norwood v. Harrison*, 413 U.S. 455 (1973). The claims made in *Norwood* are distinguishable from those made by the

¶ 107. We note that, on its face, the amended MPCP is race-neutral. As we have explained, the amended MPCP allows a group of students, chosen without regard to race, to attend schools of their choice. Furthermore, the amended MPCP requires participating schools to comply with the anti-discrimination provisions of 42 U.S.C. § 2000d. *See* Wis. Stat. § 119.23(2)(a)4. In addition, the participating schools are required to select program students on a random basis. *See id.* at § 119.23(3)(a).

¶ 108. None of the facts presented by the NAACP support a claim that the State enacted the amended MPCP with an intent or purpose to discriminate based on race. Relying solely on the racial makeup of the MPS and of the private schools likely to participate in the amended MPCP, the NAACP alleges that the program violates equal protection because its likely effect will be to further segregate the MPS. We recognize that an invidious discriminatory purpose may be inferred from the totality of the relevant facts, including the fact that a challenged law may, in effect, bear more heavily on one race than another. *See Davis*, 426 U.S. at 242. We,

NAACP in this case. First, the plaintiffs in *Norwood* did not raise a facial challenge to the Mississippi textbook program, but rather challenged the program as it applied to particular private schools. *See id.* at 457. Second, unlike the NAACP in this case, the plaintiffs in *Norwood* alleged that the private schools receiving benefits under the textbook program had racially discriminatory policies and had excluded students on the basis of race. *See id.* Third, the plaintiffs in *Norwood* alleged that the State lent textbooks to private schools without regard to whether any of those schools had racially discriminatory policies. *See id.* at 456. In contrast to the program in *Norwood*, the amended MPCP requires that all participating schools comply with the anti-discrimination provisions of 42 U.S.C. § 2000d. *See* Wis. Stat. § 119.23(2)(a)4.

however, can make no such inference in this case. In its *facial* challenge, the NAACP cannot establish facts sufficient to show that the amended MPCP has had a disproportionate impact on one race or that its provisions have been applied so as to invidiously discriminate on the basis of race. The NAACP's current facial challenge and our review in this case is limited to the statute on its face and to the stipulated facts. From the record before us, we conclude that the NAACP has not sufficiently alleged that the State enacted the amended MPCP with the discriminatory intent necessary to establish an equal protection claim. *See Davis*, 426 U.S. at 238–48.

¶ 109. While we accept as true the facts pled, we are not required to assume as true the legal conclusions pled by the NAACP. *See State v. Wisconsin Tel. Co.*, 91 Wis. 2d 702, 720, 284 N.W.2d 41 (1979). We find that there are no circumstances under which the NAACP can prevail in its facial equal protection challenge to the amended MPCP. We therefore conclude that the NAACP's claim must be dismissed as a matter of law for failure to state a claim upon which relief can be granted. *See Voss*, 162 Wis. 2d at 748; *Evans v. Cameron*, 121 Wis. 2d 421, 426, 360 N.W.2d 25 (1985).

## VII. Severability

¶ 110. Since we find that the amended MPCP passes constitutional scrutiny in all the issues presented before this court, we need not consider whether individual provisions are severable from Wis. Stat. § 119.23.

## VIII. Injunction

¶ 111. On August 25, 1995, this court granted an injunction enjoining implementation of all portions of

the amended MPCP. After further proceedings, the circuit court dissolved this injunction for all portions of the amended program except with respect to the participation of sectarian private schools. Since we now conclude that the amended program is constitutional in its entirety, we order the circuit court to dissolve the injunction for all portions of the amended MPCP.

¶ 112. When the injunction first issued against implementation of the amended MPCP, thousands of children who were eligible for full tuition under the program already had enrolled in or begun attending their new private schools. Faced with having to remove their children from their chosen schools, many parents accepted private assistance to keep their children in those schools. When the injunction is lifted, many of these students no longer will be eligible to participate in the amended MPCP because they are already attending private schools. *See* Wis. Stat. § 119.23(2)(a)2. Their ineligibility is no fault of their own, but instead is solely a consequence of this litigation. Those children certainly are among the intended beneficiaries of this program. To require them to return to MPS for a year to reestablish eligibility would be manifestly inequitable and disruptive to the public schools, to the private schools, and most importantly, to the children themselves.

¶ 113. In dissolving the injunction, we therefore remove the disability that the injunction placed on the school children, so that with respect to educational status, eligibility under the amended MPCP is determined on the date the injunction was issued.

## IX. Conclusion

¶ 114. In conclusion, based upon our review of both the statute now before us and the stipulated facts, we conclude that the amended MPCP does not violate the Establishment Clause of the First Amendment; Wis. Const. art. I, § 18; art. IV, § 18; art. X, § 3; or the Wisconsin public purpose doctrine. We therefore reverse the decision of the court of appeals and remand the matter to the circuit court with directions to grant the State's motion for summary judgment, to dismiss the NAACP's facial equal protection claim, and to dissolve the injunction barring the implementation of the amended MPCP.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 115. ANN WALSH BRADLEY, J. did not participate.

¶ 116. WILLIAM A. BABLITCH, J. (*dissenting*). I conclude, as did a majority of the court of appeals, *see Jackson v. Benson* 213 Wis. 2d 1, 570 N.W.2d 407 (Ct. App. 1997), that the amended Milwaukee Parental Choice Program violates the prohibition contained in Wis. Const. art. I, § 18, against state expenditures for the benefit of religious societies or seminaries. For the reasons recited therein, I respectfully dissent.

¶ 117. I am authorized to state that Chief Justice Shirley S. Abrahamson joins in this dissent.